## JENKINS v. THE STATE.

PER CURIAM. 1. The existence of a conspiracy may be shown by circumstantial as well as by direct evidence. *McLeroy* v. *State*, 125 *Ga.* 240 (2) (54 S. E. 125).

2. There was sufficient evidence to authorize the jury to find that there was a conspiracy between the accused and another person jointly indicted, to kill the deceased, and that the deceased was killed in pursuance of such conspiracy.

3. There were no special grounds in the motion for new trial. The evidence authorized the verdict, and the judge did not err in refusing a new trial.

*Judgment affirmed. All the Justices concur, except Russell, C. J., and Hutcheson, J., who dissent.*

No. 11026. JANUARY 16, 1936.

*L. L. Meadors* and *Loeb C. Ketzky,* for plaintiff in error.

*M. J. Yeomans, attorney-general, W. Y. Atkinson, solicitor-general, B. D. Murphy, Vance Cleveland, D. M. Parker,* and *E. J. Clower,* contra.

HUTCHESON, Justice, dissenting. As the motion for new trial is based solely on the general grounds, it is necessary that consideration be directed to the evidence. The State introduced two witnesses. One of these, Charley Jenkins, testified as follows: "I know the defendant. I knew Dan Daniel, and he is dead. He got killed in Troup County, Georgia on the 14th of November, 1934. He was struck and killed with a club-ax. I am related to the defendant. I am his uncle. The time Mr. Daniel was killed was around seven o'clock in the morning. He lived on Mr. Thornton's place. . . At the time he was killed me and Mr. Daniel was grinding an ax. . . Five of us there, Mr. Daniel, the dead man, James Jenkins, the defendant, Charley Beasley, who has already been tried for this crime, Mr. Daniel's son, and myself. James Jenkins and Charles Beasley came up there together. . . Mr. Jimmy and these other two men got there about the same time. Mr. Daniel was holding the ax, and I was turning the grindstone. . . One of these men lived near a quarter of a mile from the

house, and the other stayed about 300 yards from the house. James Jenkins lived closer than Charley Beasley to the house. When they came up there they brought an ax and a pair of scissors. . . James put the scissors on the grinding-rack to sharpen them. . . The first thing that happened, James walked up there to sharpen the scissors, and Mr. Daniel says: 'James, I want my house. I want you to get out of the house.' James said, 'Have you heard from Mr. Thornton?' . . Mr. Daniel told him Mr. Thornton had nothing to do with the house, he rented him the house. James told him he thought it was Mr. Thornton's house. That was all that was said. The lick took place then. I couldn't tell you how it happened. There was a lick. . . I had my back and side to them. I heard something hit the tin on the shelter up there, that was what made the lick. I looked back and Mr. Daniel was on the ground. . . I looked at the fallen man. . . I did not see the lick that killed Mr. Daniel. I heard something hit the roof of the house, the tin. . . The defendant, James Jenkins, was gone, and I ain't seen him no more until last court. . . Before I looked around he was gone. I did not hear anything said between Mr. Daniel and this defendant or between Mr. Daniel and Charley Beasley, except what I have stated, in reference to the trouble. . . I stayed there until Mr. Daniel was carried away. Mr. Daniel lived until next morning about four o'clock, I think, and died. He never spoke after he was hit. I saw the wound on his head. It was a big hole right up there on the side of his head. Beasley would not have to come by James Jenkins' house in order to get up to Mr. Daniel's place. He could have gone the other way. . . I hadn't heard him (the defendant) make any threat to Mr. Daniel. If he had made it I would have heard it. Mr. Daniel started the conversation when he told him he wanted him to give him his house. Beasley was standing out behind. Mr. James Daniel is a son of the dead man. Charley Beasley and James Daniel wasn't saying nothing. . . Charley Beasley killed Mr. Daniel. I ain't seen James Jenkins do nothing towards killing him, and I was present all the time. As to how far Mr. Daniel was from the defendant, I answer the grindstone ain't more than about three feet. Mr. Daniel did not have a stick in his hand. He had an ax."

The other witness for the State, J. E. Daniel, testified to practically the same state of facts, except that he was more specific, as

follows: "Papa told him, says, 'James, there are plenty houses now, and I want you to get you a house, because I am going to need mine about the first of the year. I told you here sometime back if you kept drinking on the place you would have to get you a place. I warned you two or three times, and you won't listen to me.' James says, 'I hate to have to move and have to work a whole year for house rent.' Papa told him: 'I can't help it what you have to do. You haven't worked a whole year for house rent for me. What work you have done for me I have paid you for it, and took out so much for house rent when you worked. I know you haven't been able to work much, because your leg was broke.' James says, 'Mr. Thornton been down?' Papa says 'No, he hasn't been down. Mr. Thornton hasn't got anything to do with it, because I traded for the place for a year. I am looking after it for this year.' James says, 'You haven't nothing to do with it.' I says 'James, shut up your mouth here; don't, you will make Papa mad.' James, when I said that, said something mumbling, and as he mumbled drew back his scissors; when he drew back his scissors, I guess Papa heard what he said, he must have cursed him, Papa hit at him and hit the tin roof. The defendant drew back the scissors on Papa. He just come back something like that with them. When he came back that way, my father struck at him with the ax-handle. . . As Papa hit the tin roof with the ax-handle Charley Beasley swung over, just as he hit the roof with the ax, and I jumped for the ax and I couldn't catch it before it hit him, and I grabbed the ax just about time it hit him. Papa fell to the ground, and we was tussling over the ax. When my father was struck, the defendant on trial ran. I finally got the ax from Charley Beasley by my brother coming out and drawing a shotgun on him and made him turn it loose. . . Papa had warned the defendant, two or three times before, he would have to move off the place if he didn't quit drinking. Papa had had him locked up before down there for stealing oats, and Mr. Thornton didn't want to prosecute him, and had him turned out by paying the cost; he was turned out. This happened in November. When Charley Beasley and James Jenkins came up there to the grindstone, they came up there together. No one else came with them. Charley Beasley brought an ax, and Jenkins had the scissors. . . I didn't suspicion anything when he come up there. James had never been

up there before to sharpen any scissors. My father didn't say anything to James after he was struck. Just prior to the time he was struck he told him he wanted him to give him the house. James drew back the scissors to him and muttered something; must have cursed him, the reason Papa struck at him. Jenkins did not open his mouth to Beasley after he came up there. Beasley hadn't said anything to anybody, not a word to anybody. Jenkins continued with the scissors grinding at the time this argument took place. . . When he drew the scissors Papa hit at him, and that was the reason why he dodged, because he wasn't close enough to stick him with the scissors, and he had to shun the lick to keep Papa from hitting him. . . He wasn't close enough to hit my father with the scissors unless he had made a step. He would have to make a step. He had the scissors in his hand drawed back, in his right hand, as if to make a lick. He could have jumped and did what he wanted to do with the scissors, the way he had them drawed."

It will be noted that nowhere in the evidence does there appear any proof of any conspiracy existing between this defendant and Charley Beasley, indicted jointly with him. It will also be noted that the State's witness, J. E. Daniel, testified that although the defendant "drew back his scissors" on his father, the deceased, "he wasn't close enough to stick him with the scissors, and he had to shun the lick to keep Papa from hitting him." "When in the trial of a murder case there was no evidence whatever that the accused on trial had entered into a conspiracy to kill the deceased, and the only possible theory upon which a verdict of conviction could stand was that the accused, with others, had entered into such a conspiracy, a verdict finding the accused guilty was unauthorized and should have been set aside." *Mackey* v. *State*, 112 *Ga.* 682 (37 S. E. 858). In *Brooks* v. *State*, 128 *Ga.* 261 (57 S. E. 483, 12 L. R. A. (N. S.) 889), it was held that "mere presence and participation in the act of killing a human being is not conclusive evidence of consent and concurrence in the perpetration of the act by a defendant sought to be held responsible for the homicide as aiding and abetting the actual perpetrator, unless such defendant participated in the felonious design of the person killing." See *Futch* v. *State*, 137 *Ga.* 75 (3a), 76 (72 S. E. 911). There being no evidence showing a conspiracy, and the accused not having done the actual infliction of the wound, the case seems to come clearly within

the ruling in *Fudge* v. *State,* 148 *Ga.* 149 (95 S. E. 980), that "Where one jointly indicted with others for murder is on trial, if there is no evidence of conspiracy, and the person on trial did not inflict the mortal wound, a verdict of guilty can not stand." See also *Dyal* v. *State,* 97 *Ga.* 428 (25 S. E. 319); *McLeroy* v. *State,* 125 *Ga.* 240 (supra); *Baynes* v. *State,* 135 *Ga.* 219 (69 S. E. 170); *Williams* v. *State,* 85 *Ga.* 535 (11 S. E. 859). In my opinion, in which the Chief Justice concurs, the evidence was not sufficient to authorize the verdict, and the court erred in overruling the motion for new trial.